Good morning, good morning. Mr. Clark, yes? Yes, good morning, Your Honor. May it please the Court, I'm Jeff Clark from Kirkland & Ellis here on behalf of the Air Conditioning, Heating, and Refrigeration Institute and XeroZone. And there are two big points that I'd like to focus on today, and time permitting I'll get into a third since this is a rulemaking that we think is riddled with errors. The two issues that I'd like to focus on most today are first, the illegality of the task procedure rule that the Department of Energy adopted, and second, the various problems and deficiencies in the cost-benefit analysis and the social cost of carbon analysis that's related to that, that the Department of Energy performed in this rulemaking. So I'm going to stop you because I sort of set out the way I wanted to talk to you, and well, here goes. We're limited to highly deferential review of agency actions, and many of the issues that have been raised are abuses of discretion or arbitrary and capricious acts. Of the eight issues you raised, what is the most egregious abuse of discretion in this rulemaking? And then, if you would, walk us through how this is not a simple difference in view, but an actual abuse of discretion, because that's what we need to have. Sure, Your Honor. The first thing I think I would say is that I think we have, in this case, a lot more than issues of abuses of discretion. I think we have clear violations of the statute and clear violations of the agency's regulation. And so I think the one I would give you as the biggest example is the task procedure rule, which violates both the agency's own rules, and agencies are not permitted to violate their own rules when they adopt them for themselves, and second, the statute. And how does it do that? First, in process rule 7C, DOE adopted a requirement that it have in place, before it has a notice of proposed rulemaking, test procedures so that it can measure what the energy standards that it ultimately sets are, how it will measure them. That's critical, not just to measure compliance, which is very important in and of itself, but to allow comments to be formed. If you're filing comments based on one sense of what the measurement metric is going to be, and the agency winds up measuring it by a different one, then you have, you know, a very serious legal problem. And in any event, in process rule 7C, the agency committed itself to get changes to test procedures in place before it issued change substantive standards. Now, of course, the government will get up here and they're going to say, look, there were test procedures in place when the efficiency standards were established, namely the 2012 test procedures, and that those 2014 test procedures merely clarified the 2012s. So how do we deal with all of this? Well, first point is that they had test procedures in place from 2012, and they premised the substantive standards on those 2012 test procedures, but then they revoked them. So there's a bait and switch involved there. That's the first point. And the second point is they say that they have merely clarified them, but that's not incorrect. As we describe in the record based on the calculations that we put into the test procedure rule as it was proposed, and into the substantive rule as it was proposed, the changes they made to the test procedure would increase the stringency of those test procedures by 2 to 4 percent. That's not de minimis, Your Honor. The de minimis doctrine hasn't been even invoked by the agency to defend itself. They simply argued that they believed that there would be no substantive effect on the stringency of the energy standards. They need to demonstrate that, and that's in the statute at 6293E1. It says that if the test procedures are changed, the agency needs to show the extent to which any proposed test procedure would alter the energy efficiency. They didn't do that analysis at all, and if you do the analysis, it shows that the stringency would increase by 2 to 4 percent, and that's impermissible. So they violated 6293E1, and they violated their own regulations, Process Rule 7C, by putting the test procedures out after they had put out the substantive standards that they changed, which is backwards under the procedures that they gave themselves. So that's two forms of illegality right there, Your Honor, and it goes beyond. And of course, you want them to go back to what you view as 2012 procedures. Yes, Your Honor. I mean, we think that because they issued these two rulemakings, the substantive rulemaking and the test procedure rulemaking on the same timeline, they're inherently intertwined. The agency knew that they were going to, at the end of the day, have the new substantive standards measured by the new test procedures. That's what they wanted to accomplish. Clearly, the test procedures are unlawful because they violate 6293E1 and because they violate Process Rule 7C. We think, for general reasons, that means that the whole package of these two rulemakings need to be vacated and sent back to the agency because you can't unravel that as a court. That's for the discretion of the agency to decide what to do. They could deal with this illegality either by taking it out of the height of the test procedures or they could deal with it by taking them out of the height of the test procedures. In other words, they could... Out of the height? I'm using your expression, Your Honor. Oh, okay. What I mean is they could solve for the increased stringency by revising the test procedures to eliminate that increased stringency or they could lower the stringency of the substantive standards so that when they're measured under the new test procedures, it's still a wash or some combination of the two. But it's for the agency to exercise that discretion under Chenery, not for a court to exercise that discretion. So that's why we think both of the rulemakings as a package, because they were issued as a package, need to be sent back and vacated. So, Your Honor, then... Well, Your Honor, are there concerns you have about that particular request? No. Well, I mean, as I understand the briefs, sometimes not so well, one of the issues that NAFEM wanted the Department of Energy to address was an anticipated change to available refrigerants. That's correct. And if the EPA works toward phasing out the refrigerants used in the Department of Energy calculations here, I mean, it seemed to me that your remedy would be to object to that rulemaking rather than this one. In other words, why would the Department of Energy be forced to account for a change that the EPA may or may not pursue and may not successfully enact at the time of this process? I think all of that was speculation, right? So on that issue, Judge Rovner, I disagree with that, Your Honor, and I'll make clear why. But first, I'd like to say that Mr. Longsworth, who represents the NAFEM Trade Association, is going to address that issue in detail. But let me address it at this level and say that, first of all, we don't think it's speculative. I mean, the key refrigerant that the substantive rule is premised on was highly foreseeable to be one that EPA would phase out. It wasn't purely speculative. And in any event, if you're doing comparisons of what the agency says about speculativeness, it clearly has a problem of not being consistent about that. Because as to this EPA rulemaking, which was going on at the same time, it purports to say, well, we're not going to look at that in an ostrich-like fashion. We're going to stick our heads in the sand about that. But they purport, Your Honor, to look at the impacts of carbon over a three-century time period. And that's not speculative. So it's speculative to look at what their sister agency is doing inside the federal government. That's speculative. So they want to ignore it because it would reduce the stringency of the rules they want to adopt. But when they want to consider something that's going to increase the stringency of the rules over a three-century time span, which it's virtually impossible to make predictions over. Three centuries? Three centuries, Your Honor, yes. That's correct. They do a carbon analysis that looks at the impact of an avoided molecule of carbon, essentially three centuries from now. Benefits over that purported period of time. Whereas they only look at costs over a 30-year period of time. And that's a good segue, I think, into the second big issue I wanted to talk about, which is how the agency really has done a bad job of the cost-benefit analysis here. Well, I mean, some of the criticisms in the briefs would seem to apply every time more stringent standards are proposed. In other words, costs are going to increase. Workers are going to be displaced because of higher costs, et cetera. What's different about this new standard? I mean, if we accept your argument, then the government could never require more energy-efficient models. So, Your Honor, two responses to that. First, typically when cost-benefit challenges are presented to regulations, they're presented under general APA standards of rationality review, which, as you've noted, can be very deferential depending on whether the agency makes various mistakes. Here in Section 6295.02 of APCA, there's a highly specified and highly reticulated cost-benefit determination that's set forth in seven particular factors. So Congress wanted the agency to do a really bang-up job on cost-benefit analysis here, and it didn't do it. I'll give you one very, very quick example. The agency assumed that what happens in terms of demand for goods if you impose these new regulations, which are clearly going to increase costs, is that there will be no reduction in demand for that. In other words, the technical term is the price elasticity will be zero. If I doubled the price on you, still people are going to buy exactly the same amount of commercial refrigeration equipment. That, I submit to you, Your Honors, is crazy. There is no basis for assuming that if you increase the cost of a good like this that's purchased by supermarkets and it directly feeds into food prices that the supermarkets are going to not stop buying some of this equipment because the price goes up. I mean, everyone learns in basic economics, you increase the price, you reduce the demand. It's only in very rare circumstances you're going to see no impact on demand. And yet here, the agency assumed a price elasticity of zero. You know you're into your rebuttal. Yes, Your Honor. Let me reserve the rest of my time for rebuttal. Thank you. Thank you. Everybody watch those lights, please.  Mr. Longsworth? Yes. May it please the Court. Jeff Longsworth and I am counsel to the North American Association of Food Equipment Manufacturers, or NAFEM, which develop and manufacture commercial refrigeration equipment that's used throughout the economy, from restaurants to convenience stores to grocery stores to, you know, across every factor and sector. And we're here because... I say sector, I'm going to stop you because I'm wondering where in the record is evidence that the new standards will have a disproportionate economic impact on small businesses because the Department produced evidence, you know, that in terms of energy savings, small businesses actually benefit more given their higher than average electricity costs. Well, in terms of their review of small businesses, they're obligated under the Regulatory Flexibility Act to analyze the potential impacts on small business, as well as other executive orders. And in this case, the analysis that the Department of Energy did under that process is flawed. As in many cases in this rulemaking, they set it up so that it would conveniently come to the right answer for them. So they looked at seven factors that are outlined in the briefs, but they never looked at exempting small business potentially from the rule. That's something that they're required to do both by the Act as well as by their own process rule, as well as by other executive orders. How do we know they never looked? Because in response to comments that they should have looked at it, they continue to go back to the seven factors that they looked at and said, that's all we have to look at. And then in their reply brief to the issues that we raised, they essentially dismissed this as a non-issue because they don't believe there's any private right of action to overturn regulations based on the Reg Flex Act. And yet courts have said that the key issue here before this court is whether DOE's Reg Flex analysis, option selection, and ultimate conclusions were the result of a good faith effort to canvas major options and weigh their probable effects. And they did not do that. That's the National Association of Psychiatric Health versus Shalala. And that's a case where the court looked at the Reg Flex analysis and said all you're doing here is checking the box. And you're not putting any good faith effort into this Reg Flex analysis as laid out by Congress in the Reg Flex Act. And as a result, that case was remanded back to the agency. But the Reg Flex Act is not the most significant issue here in this particular challenge. We challenged this, and we were the ones that raised the refrigeration issue because DOE knew that the two main refrigerants they were relying on were going to be banned. And the reason that that's an important issue is because they're the most economically, I'm sorry, energy-efficient refrigerants. When you change from those refrigerants to alternative refrigerants, you have to change the compressors, the chillers, all sorts of equipment in the pieces of equipment, which then raises the energy demand of that equipment. So by sticking with those two refrigerants, it was essentially they're stacking the deck for their final standards. Now, in their 2010 and 2011 preliminary technology documents, they identify this particular issue. So they knew this issue was coming back in 2010 and 2011. They also recognized that in 2009, when they passed the PRIDER standard, they specifically excluded CFCs, which at that point were legal refrigerants, but they knew were going to be banned before the new standards would become effective. They talked about this. And then in the OMB interagency process, OMB forced DOE to address the issue in their proposed rule. They took comment on it. They had a public meeting to which a NAFEM, highly respected NAFEM member, told them directly, you are analyzing for R404 and 134A. Both of these are being reviewed at this time by SNAP groups for removal from commercial refrigeration. And if you do the timeline, granted, DOE's rule came out, final standards came out March 28th of 2014. The SNAP rule, which is the refrigerant banning rule, was signed by the EPA administrator on July 10th after a 90-day OMB review. It's a 90-page rule in the Federal Register. They were working for drafting that rule for months. There's no way that EPA didn't know what they were going to do before DOE finalized this standard. But DOE wants to ignore that. EPA had not yet even begun the process to phase out the refrigerants when the standard was passed. They had begun the process. They had already drafted a rule that was ready to go through Office of Management and Budget, through hierarchy, and through Office of Management and Budget review. You're right. They had not yet proposed it or finalized it. I hope the government will respond because I may have missed something. But we don't think that it's reasonable for the government to say that it's speculative, that they don't need to consider it after they ask for comments and all. And then their post hoc rationalization was that even in the final SNAP rule that came out before briefing, they say, well, EPA found that these alternative refrigerants, in fact, may be more energy efficient, but not on a product-by-product basis, on a store-wide basis. And that information is based on experience in Europe where they've been phasing these refrigerants out, which DOE specifically said we're not going to look at European data. So we tried to give them data. We tried to help them through this process. All we asked was that they model one alternative refrigerant to see the impact on the final standard. They refused to do that. It makes the final standard flawed by the statute because it's not technologically feasible to meet these standards now without those refrigerants. They can't demonstrate that it is. And so we're saying that they've created this impossibility where when this standard goes into effect and then when the ban on these refrigerants goes into effect, basically companies are going to have one year to redesign all of their equipment to meet a standard that wasn't devised for the new refrigerants they'll be working with. So it's contrary to the statute, and it's contrary to their own process rule, and it's contrary to a rigorous, as Mr. Clark had pointed out, Congress created this statute as a rigorous kind of statute to check, provide checks and balances for DOE as they develop these standards. To just kind of arbitrarily identify various components and then put them together in a model which represents one specific sized unit, not a broad range of similar units, the level of expertise is just not evident. And if you look, you mentioned deference earlier. Even if this wasn't a statutory case, and if you look at the deference provisions, if you look at the cases we cited, the BCCA appeals group, that's where the court said, hey, we don't look at whether their model is perfectly accurate or not. We look at whether the agency's projections represent arbitrary and capricious exercise of authority. In that case, EPA was setting Clean Air Act standards. They had a model. They took real world data, verified the model, and then used the model to predict long range effects. And the court said, you know what? It's not a perfect model, but they made the effort to validate it. They explained it. It's reasonable. Compare that to the Columbia Falls case, in which EPA was using a test method to determine waste disposal standards, and the test method doesn't work for the type of waste being disposed of. The agency continued on. It was challenged. The court said, the agency's use of a model is arbitrary and capricious if it bears no rational relationship to the reality it purports to represent. And we're saying that their model, using refrigerants that will be banned, does not, and in other instances that we've identified in our brief, does not purport to a rational relationship to the real world market. I probably should have asked Mr. Clark this question, but let's see. I have you now. Can you cite any cases where a court invalidated an agency rulemaking because it was not compliant with the Information Quality Act? And, you know, would we have to split from the D.C. Circuit opinion and Mississippi Commission if we accepted your argument? And what about the Regulatory Flexibility Act? Well, I identified a case under the Regulatory Flexibility Act, the National Association of Psychiatric Health Systems v. Shalala, in which the court found that the agency did not do a reasonable effort in doing a reg flex analysis. Under the Data Quality Act, again, that's a statute that Congress put in place, and I'll let Mr. Clark use some time in his rebuttal, but at the same time it's a statute that the agency is supposed to comply with. That's not the main focus here, but it's emblematic of the kinds of kind of short-circuiting and just checking-the-box exercises that we believe the agency went through when, in fact, a more rigorous standard setting would be consistent with the rigorousness of the statute and would be more appropriate. Let me turn again to the small business argument because, you know, the government, of course, argues the savings are going to be greater for small businesses than for large. And why doesn't that adequately address small business concerns, regardless of whether they took certain things into consideration or not? I can see I'm in my rebuttal time, but the reason is that the analysis that they did is faulty to begin with. So the fact that they identified under certain circumstances that there may have been cost savings, we disagree with the entire analysis. The entire analysis is inconsistent with the reg flex statute and their own process rule, and had they done the analysis correctly, they probably would have ended up with different results. So we fault the analysis, and it's inconsistency with what their obligation was, besides just the conclusions that they've drawn from it. Reserve the remaining time. Sure. Ms. Powell, if you wouldn't mind starting with an answer to my question. Of course, Your Honor. This is with respect to what EPA was doing at the time, that question. So as far as the timeline goes, the EPA rulemaking, there was no notice of proposed rulemaking even at the time. Can you hold on a minute? Can you hear her over there? They can't hear you. No. May I adjust the microphone? That's not going to help you. You're just going to have to emote. Lean in. So at the time that DOE enacted the final standards rulemaking issue here, there was no notice of proposed rulemaking even from EPA. So the notion that these processes were proceeding in tandem is not true. So at the time, is there still a volume question? Sorry, I didn't know if you were still having trouble hearing me. It's not me. I can hear you. I want them to hear you. I don't have to answer you. They do. You can hear fine now. Thank you. So at the time there was a final DOE rule, at the end of this rulemaking, there was still no notice of proposed rulemaking from EPA. So this rulemaking completed itself before EPA formally began, which is what we say in our brief. So there's no question about the timeline there. The EPA rule was unquestionably by any measure second in time. It is notable DOE tried to take into account the question of alternative refrigerants, not because it was required to because of what EPA might have done, but because there may be benefits here in terms of opportunities for saving more energy. So DOE did want to take alternative refrigerants into account to the extent appropriate, but it was unable to obtain that information, which may sound strange, but a lot of this information is proprietary, and all of it is more readily obtained by the manufacturers who are the ones who are making, both in prototype and, petitioners allege, on the market, equipment using these refrigerants. So that's information that's more available to the manufacturers, and they were not forthcoming even though time and again DOE requested that information from them in this rulemaking. It's also notable that the record here and the EPA record both suggest that these alternative refrigerants may actually improve energy efficiency in many classes of equipment. So there may be benefits here, again, that DOE was unable to achieve because that information was not available. So the notion that alternative refrigerants will make it hard to comply with the standards or will be more costly is not borne out by what record we have. Now, the petitioners claim that the change to the test procedures is not a mere clarification, but that the new method used to calculate the total display area makes the efficiency standards more stringent. You, the government, say, nope, that's not true. How is a court to tell who is correct? What is wrong with the math that was presented by AHRI? If you are setting standards based on the size of the unit and you change how you measure the size, then you are changing the stringency of the standard, right? Potentially, Your Honor, but that's not what happened here. So in looking at the status quo ante and the 2014 final rule, which is actually not what AHRI wants you to look at, they make much of the proposed rule, which does something different, but it's not the final rule. So if you just look at what DOE relied on in the 2012 rule. Why wouldn't they want us to look at the final rule? Are they nuts? They want you to invalidate the final standards rule is what they want. They don't really care about the test procedure. They're using it as a means to call into question the final standards rule, and for several reasons, which I hope to get into, they can't do that. But just in terms of the math that they're doing, they're presuming that based on the 2012 rule and when DOE was enacting the substantive energy conservation standards, it was using an internal wall-to-wall measurement, and that's not true. That measurement, DOE has always taken the position, is not consistent with the definition of total display area, which looks at the projected visible area of product, what you can see when you look inside. Taking an internal measurement doesn't bear any necessary relationship to the transparent area on the outside of the refrigerator. So they're doing math based on a starting point that they've chosen, not what DOE had chosen. You know, it really does seem that the Department of Energy violated its own process rules by passing the energy efficiency standards first, and then amending test procedures. If we find that this was an abuse of discretion, what is an appropriate remedy? Should the 2012 test procedures be reinstated? Would the new efficiency standard be considered in that? What's the proper remedy? So in a moment, I would like to speak to why this wasn't a violation of the process rule, but to your Honor's question, the appropriate remedy, if the court finds that there is a timing issue, would be to vacate only the 2014 test procedure. As Mr. Clark himself said, the efficiency standards rulemaking was expressly premised on the 2012 test procedure rule. So at the time, the standards rule wasn't active. There was a valid test procedural rule in place, and that standards rule was itself valid. Petitioners cite no precedent to suggest that a subsequently enacted improper rule could serve to invalidate an earlier valid rule. That sequence simply doesn't make any sense. So the standards rule was premised on the 2012 rule. The 2014 rule did serve to clarify it and make it a little bit easier to administer, improving consistency. But you take that rule away, and you still have a test procedure rule and a standard rule that work together and serve to govern this industry as Congress intended. But with respect to whether there's a violation of the process rule or the statute, there emphatically is not. DOE routinely issues clarifications of this type after the fact. It understands its own process rule, which only speaks to whether there's a change or modification, not to include within those terms a clarification of this type, which does not change the substantive standard. And I'd like to try again at why it doesn't actually change the substantive standard here. So when DOE was measuring, it was taking the outside glass of the equipment, and it was including mullions and doorframes, which are the main things that were at issue here. And if you look at the comments in the 2014 rule, the big dispute is over whether mullions and doorframes should continue to be counted. And they are. In the 2014 final rule, as clarified, mullions and doorframes are still counted. That's how DOE measured before. That's how the commenters said DOE measured before. And it's how the measurement continues to apply. There was a separate question about outlier cases, which is where the math in the briefs appears. And those hadn't been considered specifically before. This is an industry – Are you talking about that table on page 28 of Nathan's brief? No, sorry, Your Honor. I'm talking about, I believe it's on page 12 of AHRI's reply brief, where they do some math to suggest that there's a percentage increase in energy use from between 1% and 4% as a result of how this is being measured. But, again, in doing that measurement, they begin – they take a starting point that's a wall-to-wall internal measurement that just isn't consistent with what DOE was doing in the first place. And then they extrapolate from there. But I think an even more salient point, given the type of administrative review that we're subject to here, is looking at AHRI's comments in the 2014 rule. With respect to these outlier cases, they said, here's how we should handle them. Count up to 5 inches of non-transparent space. And DOE said, we recognize that comment, and we think it's actually not generous enough. It doesn't count enough space in these larger outlier cases, so we'll count up to 10%. That 10% standard counts more than AHRI itself asked for in the rulemaking process. So for them to come here now, ignore that history, ignore what their comments actually were, and say that this is a change not contemplated, is just not how this administrative process or review of it is supposed to work. So they submitted a comment. DOE went even farther in the direction they were pushing. And the 2014 test procedure is entirely valid and consistent with the process that was required. Can you briefly address that letter from the Attorney General regarding the effect on competition? Is there enough in that letter to enable judicial review of the process? Is there more information available regarding the review that was undertaken by the Attorney General? Or are the petitioners and the court simply supposed to take the word of that office that there are no significant adverse effects on competition? So a few things with respect to the letter. The letter itself isn't subject to judicial review. It's part of the rulemaking record here. And one of the things that DOE was required to rely on, together with any other evidence with respect to competition. And so what the court does is look at whether DOE's decision with respect to effects on competition was reasonable in context of that evidence. All the statute requires of DOJ is to look at the record, which it did here. It attended one of the public meetings. It looked at all of the materials that had been presented to DOE. And it made a determination that there would not be meaningful impact on competition here. That's all the statute says to do. It doesn't say, and in the event you find that there won't be an impact, show all your work. It just says, discuss the extent of any impact. And it found no impact. That's the extent of it. So DOJ complied with its requirement, and although it's not discussed in the record beyond saying that it reviewed everything here, it was a robust review. DOJ was at the meeting. That's something you could tell if you went back and looked at the attendance at the public meeting list. And it provided to DOE the information it needed. Significantly here, there is no contradictory information suggesting adverse effects on competition here. Petitioners haven't pointed to any, and there isn't anything in the record. So there's nothing to call into question here the conclusion reached by DOJ. Returning briefly to the test procedures point, I do think it's also worth noting, since this is not a point that petitioners observe, but the total display area, the measurement that's at issue, isn't one that actually applies to all of the classes of equipment that are at issue. It only applies to some of them, and these are the larger remote condensing units, which may not be a point of tremendous significance, but it does seem worth noting just by way of clarification. Now are you talking about that table on page 28? No, but I'd be happy to talk about the table. Because that's the one that shows the percentages of energy reduction that are required for units with and without doors. Isn't that what you're talking about now? No, sorry, I was back on the test procedure. But I would be happy to talk about the comparative reductions, if Your Honor would like. There are a number of things. If Your Honor is concerned about that table, what we say in our brief and what continues to be true is that the percentage reductions is just a misleading figure for two different reasons. So you're saying the calculations are incorrect? No, Your Honor, but I'm saying that they don't mean what petitioners would have them mean. So they try to say because transparent doors are reduced to a greater percentage than solid doors or open containers, that something must be amiss. And that's simply not the case. That's just not an inference supported by that. There are two reasons why the percentages are different. One is that these equipments were starting at different regulatory baselines, so they aren't all governed by the earlier DOE rule. Some of these standards were set through a congressional process, some by DOE. And as a result, they were set in different ways, and so it's not going to be an apples-to-apples comparison for the starting point. But even more significantly, the technology changes are different. Demand in the industry is highest for transparent door equipment, and so the changes to the available technologies there are greater.  It found more technologies available, more improvements, for equipment with transparent doors than it did for solid door open units. And that's part of why it's so important here, and the statute does require, that DOE set these standards by equipment class. With respect to each class of equipment, DOE looks at what new technologies, and by new I mean since the last regulatory action, not looking into the future, but what technologies are available to improve the efficiency of the baseline units. And the answer to that question will be different, depending on the type of equipment you're talking about. And so that's what explains the answer to the chart on 28. Petitioners try, and this is Natham in particular, tries to get at the question of comparisons between these product classes in a number of different ways. And again, without any specificity, tries to suggest that somehow, when you look at these products together and compare them, that we know there must be something wrong. And each way they try to do that ignores the broader rulemaking process that took place. DOE used a familiar methodology here that it has used in prior rulemakings, and that was not impugned in the rulemaking process. And in doing that, it studied a representative unit, figured out which technologies could be used to improve it, the additional costs of implementing those technologies, and then it looked at a number of different places the standard could be set for that unit. It then went on to fit that data point to the market data. And one thing that petitioners don't acknowledge is that if you plot the standard for these equipment classes against the existing market data, relying on information, for example, from the ENERGY STAR directories, there are units already on the market at all the volumes that are at issue here that comply with the standards that have been set by DOE. So there's not a question about feasibility here. These are standards that existing units are already meeting compliance with. And that was among the many things that DOE looked at when it was setting these standards. With respect to the social concerns. Of course, ENERGY STAR is a voluntary program. It is. And as a regulatory matter, we continue to take the position that the two don't account for each other in the way petitioners suggest they should, that there's no cumulative burden. What I'm saying DOE did was ENERGY STAR ends up collecting a great deal of data about how equipment is performing. And DOE looked at that data about how equipment on the market is performing, and it found that many pieces of equipment, many units, are actually already complying with the standards that DOE set. With respect to the consideration of the benefits of reducing carbon emissions, as we state in our brief, although DOE did consider that analysis and it was appropriate to do so in the context of a statute charging the agency with increasing energy efficiency, energy savings, that analysis does not actually make a difference to the result here. If you just look, and this is shown in the final rule at table 1.4, it's on page 17730, that you'll see that the benefits to consumers alone, setting aside these environmental benefits, just the benefits to consumers, clearly outweigh the cost to manufacturers. And so in the record clearly presented to the court, you can see that any error with respect to the emissions benefits analysis is harmless. If you were to vacate and remand, it's clear from this record that the outcome would be the same based on the analysis that DOE has already done. Let me go into this. The department defends the insulation options by saying that this was just one way for a manufacturer to achieve the required efficiency. So if space was a concern, a manufacturer could change some other factor instead. Where in the record is there evidence that the standards could be achieved with other changes that did not affect the size of the units? I mean, it just seems a bit cavalier, doesn't it? Well, it is in the record, Your Honor. I apologize that I don't have a page number available for you, but this is the technical support document published with the final rule, and it is in there.  That would be helpful. Okay. I can look at that. I believe vacuum panels are one of the technological means available to doing that. But even more to the point, and also something DOE said in the record, is that there are units already on the market that, one, meet the new standards with just doing what they're already doing. And these are the equipment in the class that petitioners are concerned about with respect to insulation. There are also models in that class that are already using even greater insulation thickness than what DOE was considering here. So, again, the idea that it's not feasible within the parameters that they're talking about is just not borne out by the record. Are you helping certain companies? That's what your argument sounds like. No, Your Honor, and I don't think there's any suggestion of that in the record. No? I don't know if it's in the record or not. But DOE is taking into account, I mean, as it's required to by statute, what is possible. And these are just examples of what is possible. So there are many means for these companies to comply with the standards, and some companies are already doing it. With respect to the small business analysis, a few things there. As Counsel for NFM acknowledged, the standard of review there is good faith. It isn't a particularly deferential review. And the idea is to look and see whether the agency actually took account of the impacts that the rule would have on small businesses. And DOE clearly did that here in a number of ways with respect to both manufacturers and consumers. It undertook special subgroup analyses where it looked just at those entities of that size. And with respect to consumers, it did find that the benefits for those consumers would likely be outsized as compared to the benefits for other consumers. For manufacturers, it did acknowledge that the burdens would be greater than for other manufacturers because of the percentage increase to our research and development costs in relation to total revenues. It acknowledged that there would be a hardship there. That's looking just on the manufacturer side. And it also considered significant alternatives to the rule as the Regulatory Flexibility Act requires. And it did not find that any of those significant alternatives would satisfy the statutory standard of the substantive statute of EPCA, and it did not adopt them. It did not specifically consider exempting small businesses. And the statute did not. I'm sorry. It did not. No, no, no. Repeat the whole sentence. You said it too fast for me. It did not specifically consider whether to exempt small businesses, which is the thing that both petitioners are particularly concerned about. But the statute doesn't require it to. If you look at the wording, well, there are several reasons why exempting them would not have been appropriate. So first, the point that the statute doesn't require it is significant because that's the main point that petitioners are making. And what the statute says is that it requires the agency to consider any significant alternatives to the proposed rule which accomplish the stated objectives of the applicable statute. That's EPCA. And DOE has concluded that exempting small businesses is not consistent with the purposes of EPCA. EPCA contemplates a single national standard for each equipment class. And contrary to what petitioners are saying, if you exempt small businesses, you don't have a single standard. You are subjecting small businesses to a different standard. So to that extent, there's tension between EPCA and the Regulatory Flexibility Act. There's also a specific provision in EPCA that contemplates how small businesses can seek relief if they want, which, again, suggests that Congress has provided a specific means for that consideration and that it need not take place as part of the regulatory flexibility analysis. The such-as language, which also introduces the examples provided, is also not mandatory language, such as just in everyday speech, suggests suggestions rather than mandatory considerations. And petitioners do not cite anything contrary to that. The one case they cite has to do with the phrase including, which is not a perfect synonym. But getting back to the standard here, the question is whether DOE paid attention to the burdens and benefits the rule would have for small businesses and considered what, if anything, to do about it. And the record clearly shows, and there's a whole section just regarding what DOE did to consider this issue, that DOE met its burden in that respect. This is not a high bar, and DOE went far above what it was required to do. So there's no real question about what more could have been required there. With respect to price elasticity, which is also something that came up in the earlier argument, a few things there. One, this type of economic judgment is precisely the type of thing that the agency is entitled to a great deal of deference on. And the record does support DOE's assumption in that respect. First, we're only talking about a 4% price increase, not what petitioners were talking about with prices doubling. But more to the point is the type of equipment we're talking about here. This is essential equipment that doesn't have any substitutes. If a grocery store's refrigerator breaks, it's not going to get a bucket of ice and put the yogurt in the bucket. You need a refrigerator. And so when the refrigerator breaks, the grocery store is going to purchase a new refrigerator. There is some question about refurbishment and whether the economics of refurbishment play into the analysis here. And they do, but not in the price elasticity value. DOE took those into account by increasing the projected equipment lifetimes for those businesses that typically purchase refurbished equipment or engage in refurbishment, namely small businesses. So it did increase those equipment lifetimes. It took that into account, and that's what it was required to do. That's a reasonable way of responding to the information in the record. In a few places, DOE does note that it didn't have additional information to model certain of these economic things, contemplating the theoretical possibility of effects not accounted for. But that's all the agency was doing. It was acknowledging a theoretical possibility in the face of other evidence that wasn't before it. So based on the record, actually available, DOE made entirely reasonable assumptions and projections in this respect. Do you want to address the Chenery argument that came up in the reply brief? Sure, which one? I think petitioners throw that precedent around far too lightly, including by suggesting that DOE was required at every step of the process to identify precisely the legal authority it was relying on. A rulemaking is not a legal brief. In the social cost of carbon analysis, DOE didn't have to identify with specificity where its authority was to consider the benefits of emissions reductions. Of course it has that authority in a statute that's about the benefits of energy savings. It's easily accommodated by the statutory factors there, and it was presented in the discussion of energy savings to the nation. So I think petitioners easily go too far with that. In terms of Chenery as it's intended to be used, did the agency adequately explain its reasoning and how it reached its conclusion? I think this rulemaking is a tremendous example of the administrative process working well. There are three different technical support documents and a 100-page final rule, a 700-plus page technical support document supporting that final rule, and a robust exchange between stakeholders and the agency. Throughout this process, DOE has welcomed input, made adjustments to input, and explained those adjustments and how it's been making its assumptions. So I think this constant suggestion that DOE has been cavalier and not explained itself is wildly misplaced in context of this rulemaking. I'd certainly be happy to address any other concerns of the court since this will be my last opportunity, but otherwise we think that the rulemaking was a good one. Thank you. Thank you, Ms. Powell. Okay, Mr. Clark. May it please the court. First, maybe before I get into it, I'd just like to ask if there is an opportunity given to the government to say something about that insulation issue, we'd request an opportunity to address it. Of course. Always. So, Your Honor, I think you hit on the theme of what we think is wrong with this rulemaking, which is that they dealt with many issues in an entirely cavalier way. And I'll just start with the price elasticity of demand issue, because you can't just claim deference, which is I think what Ms. Powell was saying, and saying, well, I'm going to pile the rulemaking documents up and say we have hundreds of pages. It's not an exercise in that. It's a question of what is the analysis that they actually did. That issue really is a great poster child, because if you increase the price of something, you're going to see the demand decrease. They have the argument about the case with the yogurt, but obviously where the rubber meets the road is, yeah, maybe someone would continue to buy the case even if the price increases. Some people will. But the point is that what happens to small businesses who can't afford that? They'll go out of business. And then what's the net effect of that across an entire demand curve? It's a reduction in demand. And that's exactly what we're saying. It's just irrational to say that there's not a reduction in demand. I don't think that Ms. Powell has a response to that. Let me try to take the rest of the issues in the order that they came up, time permitting. So first was the issue that you raised, Judge Robner, about small businesses. What did the agency say? I'm going to read you something. This is the agency speaking. This isn't me speaking. The agency said small firms would likely be at a disadvantage relative to large firms, in meeting the amended energy conservation standard for commercial refrigeration equipment. They face disadvantages in terms of access to capital, the cost of retooling production lines and investing in redesigns, the pricing for key components. As a result, DOE could not certify, it could not certify that the amended standards would not have a significant impact on a significant number of small businesses. And that's at 79 Federal Register 17,814. So that's the agency itself admitting that it has a small business problem, and 70% of the manufacturers regulated by this rule, including my client, ZeroZone, is a small business. It's a very serious issue. Let me tie that to the issue that you raised as well, Your Honor, of the AG letter. Because that letter is about the issue of what is the impact on competitiveness, because you have, you know, you're disproportionately affecting small businesses, and you might drive them out of business, create more concentration, lead to antitrust effects, and all you get from the AG's delegate is a letter that says, I've concluded there's no impact. I mean, we're not asking, as Ms. Powell was trying to say, for all work to be shown, but this is the equivalent of showing no work. And it really provides you nothing to judicially review, and that's contrary to the way administrative law works. And we think that has to be reversed as well. On the issue of speculation that I raised, you know, if we're talking about what happens with the refrigeration rule, or we're talking about what happens with other issues the agency needs to consider, we think they've flatly dealt with that issue in an inconsistent way, and agencies can't act inconsistently. You know, they were perfectly willing, when it would increase the stringency of the rule, to consider impacts going out for three centuries. Ms. Powell had no response on that issue. On the issue of the measurement of the total display area, Your Honors, one issue argument I didn't get to make, but I'd really like for you to look at the briefs on, is to look at 6313C1D of the statute. That provides a lock-in. So this is a Chevron Step 1 issue that says that the test procedure, that the measurement of total display area is to be measured by the AHRI 1200 standard. And here the agency changed the AHRI 1200 standard. They flatly can't even do that. So they have not only the problem of the sequencing problem of getting the test procedures out after the substantive rule, when their process rule commits them to do the reverse, they not only have the 6293E1 problem, they have this problem of the fact that they don't even have the authority to change the test procedure from the AHRI test procedure. My red light is on. I see that my time is up. If you'd like, and I'd like to continue, but I will sit down if you direct me to. I think I have to direct you to. Thank you, Your Honor. Thank you. May it please the Court, I also would like to respond to a couple of the issues that were raised and discussed. Again, this is a statutory issue. The statute says no rule may be affirmed unless supported by substantial evidence. DOE can't meet its statutory obligation to show energy efficiency will result from the rule. They have a process rule that says use transparent and robust analytical methods. Must be able to explain and reproduce the results. They had a locked model in which we couldn't reproduce any results. They compared it to takedowns on one equipment type, an entire broad range, and said it generally agreed. They indicate that we weren't forthcoming with information on alternative refrigerants. That's just not true. If you look at our brief pages 19 to 22, we highlight a number of comments throughout the entire process where we said, here are the problems, here's how you fix it, go look at Europe, go look at elsewhere. And they said, oh, we're not going to look at Europe. We don't want to look at that until later on when all of a sudden EPA looked at it. The insulation issue, if you don't mind, I'll give you a little bit of insight on that. Is there a unit out there that works with increased insulation? Yes, but it's not the typical unit. The typical unit is in a restaurant where it is locked in with a footprint. And DOE says, now you have to increase the insulation on the sides of the refrigerator. Well, we can't do that because all the trays that go into the refrigerator are the same size that go into the oven and go in everywhere else. We can't increase the footprint unless we're rebuilding all the restaurants. So, yes, there's a standalone unit somewhere that uses wider insulation. But in the real application of these technologies, DOE just doesn't see the impacts of what they've tried to do here and the real impact on small businesses. My colleague identified the same thing I was going to on the impact on small businesses. And yet the government's position is it's not that high a bar. Well, we think it is a high bar. We think that they have to be. This is a rigorous statute, and we think that Congress did that intentionally, and they need to meet the rigors of the statute. And even if it was a deferential position, they haven't defended and explained and validated their model in a way that these other cases have identified where they've provided discretion on those kinds of things. If you look at the other cases we've cited that say, no, the agency's not done enough on their model, we think that that issue applies better here than in the other cases. And then finally, in terms of market compliance, again, DOE said when we identified that their linear equation had a significant impact on small refrigerators, less than seven cubic feet, the kinds of refrigerators that sit on bars with glass doors, their response in their brief was, well, you're nitpicking, and there are not many of those units. Those units make up 20% of the marketplace. So their knowledge of either the market or of how these things interplay in the real world is lacking in this rulemaking. It's a tough challenge for them, recognizing that they're trying to do things that our engineers, that are the best in the world, takes years and PhDs to do, and now they're trying to come in and follow along. We tried to help them every step of the way, and unfortunately they dismissed a lot of our comments and a lot of our approaches. But we think they did so at their peril based on the statutory obligation that they have. Mr. Clark, come on back up. I'm going to give you two more minutes. I feel that you had something you really wanted to say. Sure, Your Honor, yes. So the next issue that I was going to get to was the issue about how the process rule was violated. And I think if you look at the chronology of when the rulemakings were adopted, we have a footnote in our brief on this. I think it's the opening brief, but it might be the reply brief, where we show that it's like two trains going down the track parallel to one another. And then, even though the substantive rule started first, the test procedure rule suddenly comes in and locks in first. So the net effect of these two rules together is that you're going to be applying the new stringent standards using the new test procedure when the rulemaking that was adopted with the substantive standards in it said that it was going to be applying the old test procedures. It's a classic bait and switch. It's something that the agency never explains. And for that reason, Your Honor, and especially not to burden the court, I'll stop with this issue, that's why we think both of these rules need to be vacated. They need to be vacated because they were intertwined with one another and because you don't know exactly what the agency would do to fix the problems that have been identified. There are rampant problems with the substantive rules. There are clear violations of law in adopting the test procedures. You really have to just vacate both of the rules and send them back and let the agency decide how to fix the mess and how to decide, you know, which... Do they want the new test procedure? Do they want the new stringency? Do they want a new combination of the two? It's not something where the court should decide which one to vacate. The two things are inherently intertwined, and they're both a mess. Thank you. Thank you very much. Thank you to all parties. And, of course, the case will be taken under advisement.